**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **TAMMY BUFFORD,** *individually and as* *Administrator of the Estate of Cortez D.* *Bufford*, **and ANTOINE BUFFORD,**  )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

TAMMY BUFFORD, *individually and as* )
*Administrator of the Estate of Cortez D.* )
*Bufford*, **and ANTOINE BUFFORD,** )
                                        )
     **Plaintiffs,** )
                                        )
     **vs.** )     **Case No. 4:22-CV-01319-NCC**
                                        )
**MICHAEL SACK, POLICE OFFICER** )
**LUCAS ROETHLISBERGER, POLICE** )
**OFFICER MARTINOUS WALLS, BRAD** )
**ARTEAGA, SONYA JENKINS-GRAY** )
**EDWARD MCVEY, CHRIS SARACINO,** )
**and MAYOR CARA SPENCER,** )
                                        )
     **Defendants.** )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants'[1] Joint Motion for Summary Judgment (Doc. 69) and Plaintiffs' Motion for Summary Judgment (Doc. 77). The motions are fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 17). For the following reasons, Defendants' Motion for Summary Judgment will be **GRANTED IN PART and DENIED IN PART** and Plaintiffs' Motion for Summary Judgment will be **DENIED**.

---

[1] On August 12, 2025, Brad Arteaga, Sonya Jenkins-Gray, Edward McVey, Chris Saracino, and Mayor Cara Spencer, the individual board members of the St. Louis Board of Police Commissioners in their official capacities, were substituted for the City of St. Louis, Missouri, as Defendants in this case (Doc. 119) pursuant to their uncontested Motion for Substitution of Parties (Doc. 117). To the extent this Order refers to claims brought against the City of St. Louis, Missouri (the "City"), the individuals named above are substituted in its place.

# I.  FACTUAL BACKGROUND[2]

## A.  Initial Encounter and Shooting

This case arises out of the December 12, 2019 shooting death of Plaintiffs' son, Cortez D. Bufford ("Bufford").  On that date, members of the St. Louis Metropolitan Police Department ("SLMPD") Mobile Reserve Unit were patrolling in the Dutchtown neighborhood, led by Lieutenant Christian Stamper ("Stamper").  At approximately 9:15 p.m., after assisting other officers[3] with a traffic stop, Officer Lucas Roethlisberger ("Roethlisberger") and Officer Martinous Walls ("Walls") (together, the "Officers") were parked in a 7-Eleven lot across from a BP gas station ("BP") at the south-east corner of Virginia Avenue and Bates Street ("Bates").  The Officers were uniformed and sitting in a marked SLMPD Chevrolet Tahoe ("Tahoe") bearing "ST. LOUIS METROPOLITAN POLICE" in blue reflective capital letters.  Walls was the driver and Roethlisberger the passenger.

Roethlisberger observed a black male, later identified as 24-year-old Bufford, wearing a black puffy jacket, an orange sweatshirt, dark pants, and a satchel across his chest, exit the BP after purchasing a drink and cigarettes.  The Officers saw Bufford stand near the entrance to the BP, look at the Tahoe, and then walk away.  They found Bufford's actions suspicious and decided to approach him.[4]  Roethlisberger believed Bufford's actions were "just kind of suspicious" and he and Walls "decided to maybe do a field interview."

---

[2] Unless otherwise specified, these facts are taken from Defendants' Statement of Undisputed Material Facts (Doc. 71), Plaintiffs' Statement of Uncontroverted Material Facts (Doc. 79), Defendants' Response to Plaintiffs' Statement of Uncontroverted Material Facts (Doc. 87), and Plaintiffs' Response to Statement of Material Facts (Doc. 88).  Additional relevant facts are cited in the discussion below.

[3] Roethlisberger and Walls had been assisting Officers Zach Opel and Courtney Nash with a traffic stop.

[4] Defendants describe their initial approach as a pedestrian check or field interview.

Bufford walked toward the back of the BP.  Walls drove south on the west side of the BP, toward the back of the gas station, and spotted Bufford.  Roethlisberger observed Bufford's hands at his waist area and his head canted down a little bit, but did not see Bufford's satchel. Roethlisberger decided to arrest Bufford on the belief he broke the law by urinating in public. Neither officer saw Bufford's genitals exposed yet Roethlisberger yelled to Bufford, "Put your junk away."  Roethlisberger got out of the Tahoe and said to Bufford, "Hey man, let me talk to you."

Bufford ran northwest when Roethlisberger exited the Tahoe and approached him. Neither Roethlisberger nor Walls identified themselves as police officers or told Bufford he was under arrest.  Walls drove the Tahoe in front of Bufford, attempting to stop his path of travel. Bufford, who was watching Roethlisberger, collided with the Tahoe and fell to the ground. Roethlisberger testified that at this point, he yelled "Police, stop. Police, stop," but Walls did not recall whether Roethlisberger did so.  Bufford then got up and began running again. Roethlisberger drew his firearm and chased Bufford.  Walls announced on the police radio that Bufford was armed.

Bufford ran between two houses at 530 and 532 Bates.  Roethlisberger pursued him. Bufford attempted and failed to scale a fence at the end of the gangway ("initial gangway"). Roethlisberger attempted to apprehend Bufford, grabbing his arm and getting him to the ground and on his back.  Bufford broke free and ran the same way he came in.  Bufford then crossed Bates and ran between the houses at 533 and 535 Bates.  Roethlisberger continued his pursuit. Bufford again attempted and failed to scale a fence at the end of that gangway ("second gangway" or "gangway").

According to Roethlisberger, Bufford turned and faced him.  Roethlisberger then approached and grabbed Bufford.  Roethlisberger had his service firearm in his left hand and told

3

Bufford to "Please stop" and repeatedly stated, "Drop the gun." Roethlisberger believed Bufford

was shooting at him. In fear for his life, Roethlisberger fired multiple shots at Bufford, then took

cover behind the front corner of the residence at 535 Bates and called for emergency medical

services ("EMS"). Roethlisberger did not use his flashlight in pursuit of Bufford or when he shot

him.

  According to Plaintiffs, Bufford was facing away from Roethlisberger when

Roethlisberger started shooting, and there was not enough light in the gangway for

Roethlisberger to see whether Bufford had a gun. Plaintiffs cite the testimony of other SLMPD

officers who needed flashlights to see in the gangway. Additionally, Plaintiffs rely on an

unrefuted report by forensic expert Jeremy Bauer, Ph.D. ("Bauer"). Bauer opined as follows.

Bufford was not facing Roethlisberger when Roethlisberger fired the first shots at Bufford.

Roethlisberger fired eight bullets over the course of approximately two seconds, and Bufford was

struck by five or six of those bullets. Bufford rotated to his right and fell to the ground as

Roethlisberger fired, and Roethlisberger was moving either toward or away from Bufford, as

opposed to standing stationary, as he shot. Bufford was not facing Roethlisberger, as

demonstrated in Roethlisberger's deposition and his January 9, 2020 video interview with the

SLMPD Force Investigation Unit. Bauer concluded that the first shot fired at Bufford entered

Bufford's back.

  The parties agree to the following. After Bufford collided with the Tahoe and resumed

running, at approximately 9:24 p.m., Walls announced over the police radio that they were

pursuing a suspect, and that the suspect was in possession of a firearm. Approximately 29

seconds later, Walls announced "Shots fired! Shots fired!" over the radio. Walls was driving in

the alley, south of the initial gangway, when he heard gunshots and circled back to where

Roethlisberger and Bufford entered the second gangway.  Approximately 35 seconds later, Walls radioed, "We need EMS urgent."

Walls observed Roethlisberger on the north side of Bates, near the front of the residence at 535 Bates.  Walls entered the gangway, saw Bufford lying on the ground, placed handcuffs on him, and rolled him over.  According to Walls, Bufford had a firearm with an attached extended magazine and pills underneath his body.  At no point during the incident did Walls see Bufford with a weapon in his hand.  Walls could not remember how Walls came to have blood on his shirt during or after the incident.

Stamper was also present the night of the shooting.  He observed Roethlisberger run after Bufford in the BP parking lot and the Tahoe move quickly around the lot.  Stamper drove alongside Bufford and Roethlisberger during the initial pursuit, prior to the two men entering the initial gangway.  While driving alongside Bufford and Roethlisberger, Stamper did not observe anything protruding from Bufford's satchel.

Bufford was pronounced dead at 9:34:00 p.m. on December 12, 2019.  A post-mortem examination indicated Bufford suffered several gunshot wounds and two small abrasions: one to his right knee and a second to his left thigh.  The eight shell casings recovered from the scene were Winchester casings fired from Roethlisberger's service weapon.  The bullets recovered from Bufford's body were fired from Roethlisberger's service weapon.

### B.  Post-Incident SLMPD Investigations

#### 1. Firearm Examination

The SLMPD conducts DNA testing on a firearm and checks for fingerprints prior to the City of St. Louis' ("City") firearm lab receiving a gun.  The gun found underneath Bufford (the "subject gun") was analyzed for prints, and no identifiable prints were developed.  Further forensic testing was conducted in the firearms lab, and a firearm comparison report was prepared

5

by SLMPD Officer and firearms examiner Julie Davis ("Davis").  Davis reported that none of the 31 cartridges recovered from the extended magazine collected with the subject gun showed firing pin impressions on the primer of the cartridges.  A pin impression would indicate an attempt was made to fire a cartridge.

Davis is familiar with collection procedures for firearms evidence.  When a gun is collected from a scene with a magazine inserted, the components are collected together unless the components "absolutely cannot fit" in the same evidence box.  If a magazine is separated from a firearm, it must be collected in an envelope separate from the gun.

Plaintiffs' expert, Bauer, reviewed photographs of the collection of the subject gun, showing a gun placed in a cardboard evidence box with the magazine removed.  Bauer opined the collection method indicated a lack of care to preserve the subject gun evidence, jeopardizing its integrity, including the integrity of any blood evidence, which should have been unaltered and made available to all parties investigating the matter.

## 2.  SLMPD Use of Force Investigation

As of December 2019, Michael Sack ("Sack") was the SLMPD Commander of Professional Standards.  In June 2022, he assumed the role of interim Police Commissioner.  The Police Commissioner ("Commissioner") had authority to hire, train, supervise, discipline, and effect the retention determinations of the City's law enforcement officers.  Sack is currently[5] the SLMPD Commander of Professional Standards.

SLMPD Special Order No. 2-12, Section II, issued March 9, 2016, discusses the duties and responsibilities of the Commissioner, and instructs that the Commissioner is the "Chief Executive Officer of the [SLMPD], with command over all functions of the [SLMPD] and charged with the authority to create, promulgate, and enforce all policies, . . . is responsible for

the enforcement and observance of all laws, ordinances, and regulations, . . . and is the Appointing Authority for the [SLMPD]; vested by law or Ordinance with authority to make appointments to any City Service position."

The Special Order concerning the use of deadly force in effect on December 12, 2019, stated that deadly force may only be used in very limited circumstances, including "to protect the officer or others from what is reasonably believed to be an immediate threat of death or serious physical harm." Sack reviewed the facts of Roethlisberger's conduct and concluded that Roethlisberger exercised the highest degree of care in the application of force against Bufford and that Roethlisberger's use of force was consistent with City policy. Both Roethlisberger and Walls are current City employees.

As of this date, no meeting of the deadly force tactical review board has occurred regarding Bufford. According to Sack, a meeting will occur pending a review by the Circuit Attorney's office in conjunction with the SLMPD's Internal Affairs Division. Edward Roth ("Roth"), an attorney and employee of the City Counselor's office, was deposed as the corporate representative for the City. Roth testified that "[t]he circuit attorney reviews all officer-involved shooting investigations by the force investigative unit." Roth Dep. 146:15-17. The force investigative unit writes a report but makes no charging recommendations, as that determination is made solely by the Circuit Attorney. Roth testified that "when Kim Gardner was circuit attorney, [she] determined early in her tenure that they were not going to review police shooting cases or they simply took no action on them." Roth Dep. 146:21-25.

## II. PROCEDURAL BACKGROUND

On December 8, 2022, Plaintiffs filed this action against Defendants (Doc. 1). Tammy Bufford and Antoine Bufford are the surviving natural parents of Cortez Demarko Bufford (Doc.

---

[5] Current as of the filing of the parties' Motions for Summary Judgment.

1 at 2).  Plaintiffs assert a 42 U.S.C. §1983 unreasonable seizure and excessive-force claim against Roethlisberger (Count I); a §1983 failure to intervene and excessive-force claim against Walls (Count IV); claims under Mo. Rev. Stat. § 537.080.1(1) (Missouri Wrongful Death statute) and § 537.020 (Missouri Survival Action statute) (Counts II, III, V, and VI) against Roethlisberger and Walls; § 1983 excessive force claims against the City and Sack (Counts VII and XII); § 1983 claims asserting that the City and Sack (in his official capacity) failed to "properly hire, train, supervise, retain, and conduct a fair and impartial investigation" (Counts VIII and XIII); Missouri Wrongful Death and Survival Action claims asserting that the City and Sack (in his official capacity) "[are] vicariously liable for the wrongs of [] employees committed within the course and scope of their employment" (Counts IX, X, XIV, and XV); and negligence claims against the City and Sack (in his official capacity) under Mo. Rev. Stat. §§ 537.020, 537.030, and 537.600, for injuries resulting from Walls' operation of his police vehicle (Counts XI and XVI).

The Court denied Walls' Motion for Judgement on the Pleadings on Count V (Doc. 33) and Sack's Motion for Judgment on the Pleadings on Counts XII, XIII, XIV, XV, and XVI (Doc. 44).  Defendants now move for summary judgment on all claims, and Plaintiffs move for summary judgment on Counts I through XI.

### III.  SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts.

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.  "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson*, 477 U.S. at 248).  In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the nonmoving party.  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).  "Though we are required to make all reasonable inferences in the non-movant's favor while reviewing the facts, we are not required to 'accept unreasonable inferences or sheer speculation as fact.'"  *Klum v. City of Davenport*, No. 24-2165, 2025 WL 2167879, at *2 (8th Cir. July 31, 2025) (quoting *Gilani v. Matthews*, 843 F.3d 342, 347, 349 (8th Cir. 2016)).  The evidence is not weighed, and no credibility determinations are made.  *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

When cross motions for summary judgment are filed, "each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law."  *Alberternst v. Hunt*, No. 4:10-CV-642-JAR, 2011 WL 6140888, at *2 (E.D. Mo. Dec. 9, 2011) (citing *Husinga v. Federal-Mogul Ignition Co.*, 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007)).  In other words, "the Court's approach is slightly modified," viewing the record in the light most favorable to Defendants when considering Plaintiffs' motion and viewing the record in the light most favorable to Plaintiffs when considering Defendants' motion.  *Woodstone Ltd. P'ship v. City of Saint Paul, Minnesota*, 674 F. Supp. 3d 571, 584 (D. Minn. 2023).  "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact."

*Seaworth v. Messerli*, Civ. No. 09–3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), *aff'd*, 414 Fed. Appx. 882 (8th Cir.2011).

## IV.  DISCUSSION

### A.  Defendants' Motion for Summary Judgment on All Counts

#### 1.  Counts I and IV: § 1983 Unreasonable Seizure and Excessive Force Claims Against Roethlisberger and Walls

In Counts I and IV, Plaintiffs allege that the Officers, acting in their personal capacity, violated Bufford's Fourth and Fourteenth Amendment rights by unlawfully detaining him and using excessive and deadly force against him without due process and equal protection of law (Doc. 1 at 11-12, 18).  Defendants assert the Officers are entitled to qualified immunity because their conduct did not violate clearly established law (Doc. 83 at 5).[6]

Plaintiffs respond that Bufford had a clearly established right under the Fourth Amendment to be free from (1) unreasonable seizures when they initiated a stop without reasonable suspicion and/or without probable cause, (2) unreasonable seizures when they attempted to effectuate a warrantless arrest without probable cause, and (3) excessive force, all of which Defendants should have known were unlawful as police officers (Doc. 95 at 5).

Defendants reply that, for quality immunity purposes, Plaintiffs' description of Bufford's clearly established rights is too general and broad, and that Plaintiffs misapply caselaw with respect to probable cause (Doc. 96 at 1-2).  Defendants argue that the Officers formed the intent to arrest Bufford after they witnessed him urinating, and that the Officers' descriptions of the way Bufford was standing demonstrate probable cause, despite Walls' admission that Bufford

---

[6] The Court notes that the parties erroneously discuss Walls' alleged failure to intervene in relation to Count IV.  Plaintiffs raise his failure to intervene as part of Count V, their wrongful death claim.

may have been engaged in another activity (*id*. at 2-3). Defendants argue that a mistaken perception, if reasonable, does not violate the Fourth Amendment.

### a. Qualified Immunity Standard

"Section 1983 prohibits government officials from depriving other persons of 'rights, privileges, or immunities secured by the constitution.'" *Hassan v. City of Minneapolis, Minn*., 489 F.3d 914, 918 (8th Cir. 2007). "In a § 1983 action, an officer is entitled to qualified immunity unless: (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established." *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 620 (8th Cir. 2023). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). If properly applied, "[p]ut simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

The test for qualified immunity is as follows:

> The test for whether an officer is entitled to qualified immunity is twofold: (1) whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009); *Henderson v. Munn*, 439 F.3d 497, 501–02 (8th Cir. 2006). If no reasonable factfinder could answer yes to both of these questions, the officer is entitled to qualified immunity. *See Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006).

*Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009); s*ee also Ching*, 73 F.4th at 620. "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (quotation omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*,

563 U.S. at 741.  A court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"For suits, such as this one, brought under 42 U.S.C. § 1983, 'government officials are entitled to summary judgment if they are entitled to qualified immunity.'" *Willis v. Mills*, 141 F.4th 905, 911 (8th Cir. 2025) (quoting *Setchfield v. St. Charles County*, 109 F.4th 1084, 1089 (8th Cir. 2024)).  "The party asserting the defense of qualified immunity has the burden of establishing the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *McGuire v. Cooper*, 952 F.3d 918, 922 (8th Cir. 2020) (citation modified).  At the summary judgment stage, qualified immunity is precluded if a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful.  *Aden as trustee for Estate of Aden v. City of Bloomington, Minn.*, 128 F.4th 952, 957 (8th Cir. 2025).

### b.  Excessive Force

"Claims against local police for excessive force during a seizure are analyzed under the Fourth Amendment's reasonableness standard." *Lankford v. City of Plumerville*, 42 F.4th 918, 921 (8th Cir. 2022).  "The use of deadly force to restrain a person is a seizure under the Fourth Amendment." *Dimock ex rel. Dimock-Heisler v. City of Brooklyn Ctr.*, 124 F.4th 544, 552 (8th Cir. 2024).  "Objectively unreasonable uses of deadly force violate the Fourth Amendment." *Klum v. City of Davenport*, No. 24-2165, 2025 WL 2167879, at *3 (8th Cir. July 31, 2025).

"In *Graham v. Connor,* the Supreme Court mandated the application of an objective 'reasonableness' standard when evaluating claims that government agents used excessive force in violation of the Fourth Amendment." *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Under *Graham*,

[i]t is well-established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396-97, 109 S.Ct. 1865. The determination whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

*Chambers*, 641 F.3d at 905-06. "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela v. Hughes*, 584 US. 100, 103 (2018) (quoting *Graham*, 490 U.S. at 396-97).

Fourth Amendment reasonableness is not precisely defined or mechanically applied, but a fact specific inquiry, requiring "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Further,

[t]hose circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Id.* (quoting *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466). "The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used." *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011).

13

*McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022). When analyzing the totality of the circumstances, "[t]here is no 'easy-to-apply legal test' or 'on/off switch' in this context." *Barnes v. Felix*, 145 S.Ct. 1353, 1358 (2025) (quoting *Scott v. Harris*, 550 U.S. 372, 382-383 (2007)).

In *Barnes v. Felix*, the Supreme Court reiterated that the severity of the crime prompting the stop, the actions the officer took during the stop, and the stopped person's conduct are relevant to the analysis. *Id. Barnes* held that the use of force inquiry "has no time limit," eschewing the "moment-of-threat rule" as conflicting with a court's ability to analyze the totality of the circumstances. *Id.* The Court explained:

> Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose." Brief for United States as *Amicus Curiae* 14. Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

*Id.*

A court considers the 'totality of the circumstances but, "absent probable cause for an officer to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable." *Cole Estate of Richards v. Hutchins*, 999 F.3d 1127, 1132 (8th Cir. 2020) (citation modified). "Generally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar 'menacing action.'" *Id.* (citing *Partridge v.*

*City of Benton*, 929 F.3d 562, 566 (8th Cir. 2019)).  "[T]he requirement that the threat be

reasonably perceived as 'immediate' means that if the threat has passed, so too has the

justification for the use of deadly force."  *Id*.

### i.  Roethlisberger's Use of Force

Defendants assert Roethlisberger is entitled to qualified immunity on Plaintiffs' excessive

force claim because he had probable cause to believe Bufford posed a threat of serious physical

harm (Doc. 83 at 6).  They also argue Roethlisberger did not violate a clearly established right

(*id.*).

According to Defendants, Roethlisberger acted reasonably when he used deadly force

because he had probable cause: to stop Bufford for public urination, to pursue Bufford as he

resisted arrest by fleeing, and to believe that Bufford posed a threat of serious physical harm to

him when Bufford pointed his firearm at him (*id.* at 7).  Defendants argue that Plaintiffs are

unable to present competent evidence to counter the Officers' sworn testimony, and that their

expert Bauer's opinion that Roethlisberger did not see Bufford point a gun at him is speculation

(*id.* at 8-9).  Defendants finally argue that Plaintiffs cannot establish Roethlisberger violated a

clearly established right because officers are permitted to use lethal force when faced with the

threat of deadly violence (*id.* at 9).

Plaintiffs respond that Bufford had a clearly established right to be free from excessive

force (Doc. 95 at 12).  They assert there is a material dispute as to whether Bufford pulled a gun

out of his satchel and pointed it at Roethlisberger, whether the gun attributed to Bufford was

planted by the police, and whether Bufford possessed the gun on the night of the incident (*id.* at

14).

Defendants reply that Bauer's opinions, supporting Plaintiffs' theory that Bufford did not

have a gun, cannot controvert the Officers' testimony (Doc. 96 at 3).  Defendants argue that

although Bauer speculates that the Officers could not have seen a gun as Bufford got off the ground after impact with the Tahoe, Walls testified he saw the gun while Bufford was running (Doc. 96 at 3). They assert Bauer failed to consider what Walls saw as Bufford fled, rendering his opinion irrelevant (*id.*).

The Court agrees with Defendants that *if* it were undisputed that Bufford was armed and pointing a gun at Roethlisberger when Roethlisberger fired at him, Roethlisberger would be entitled to qualified immunity. Under that set of facts, Roethlisberger would have had probable cause to believe that Bufford posed an immediate and serious threat to Roethlisberger and deadly force would have been constitutionally reasonable.

After careful review of the record, however, the Court finds Plaintiffs have produced sufficient evidence to give rise to a genuine dispute of fact about whether Bufford had a gun and, if so, whether he was pointing it at Roethlisberger at the time Roethlisberger shot him. Based on the evidence presented, a reasonable juror could find that Bufford could not have been pointing a gun toward Roethlisberger at the time of the shooting, and that Roethlisberger could not have seen Bufford pointing a gun at him.

First, there is eyewitness testimony that tends to support Plaintiffs' position that Bufford did not have a gun. After Bufford collided with the Tahoe and got up and began running again, Lt. Stamper was driving on the street parallel to the sidewalk where Roethlisberger was chasing Bufford. He testified he did not see a firearm protruding from Bufford's satchel:

> Q.   Did you observe a firearm on or about the person of Cortez Bufford in those moments right there at the gas station where the foot pursuit was beginning?
>
> A.    No.
>
> Q.   Did you observe at that moment any type of satchel that Cortez Bufford may have had?

A.      At that moment, no, I do not believe I saw anything like that.

Q.      And it's fair to say you were across the street at this point in time, or thereabouts?

A.      Yes.

. . .

Q.      Okay. What did you observe then?

A.      They continued to run west, I began to drive west on Bates, and that's kind of where that part of that ended.

Q.      What does that mean? I'm sorry.

A.      I'm sorry. So that's kind of what the next -- I was literally alongside, or parallel to Officer Roethlisberger and the individual.

Q.      Okay. And what happened then?

A.      I kind of maintained a visual of the overall scene, so the individual and Officer Roethlisberger behind him.

       I did, at some point during that time, observe him to have a satchel of some type around his upper body, or chest area.

. . .

Q.      Okay. When the -- When Cortez made an abrupt left-hand turn in between the houses onto south Bates, you said you observed a satchel on him; is that fair?

A.      I don't know that it was when he turned. Some time during, between here and there, [indicating], as I was following along, I did.

Q.      Well, what did it look like?

A.      Well, we commonly refer to as a man bag, if you will, so something of that nature.

Q.      Was it, was it cross-strapped across his person?

A.      Yes, I believe so. I don't recall specifically, but, yeah.

Q.      Do you remember seeing it flopping?

17

A.    No.

Q.    Okay. Do you know if it was on his left side, his right side, or his front?

A.    It was oriented towards the front, towards his chest area.

Q.    Do you remember seeing anything protruding from that satchel?

A.    No.

Q.    And at some point in time you said you were right alongside Cortez and Officer Roethlisberger during that foot chase; is that fair to say?

A.    Yes.

Stamper Dep. 47:4-53:4.  These statements support Plaintiffs' contention that Bufford did not have a gun or that the Officers did not see him with a gun.

Plaintiffs' expert Bauer also opined that "[g]iven the description of [Bufford's] alleged interaction with the Tahoe, it is unlikely Walls would have been able to see [Bufford's] [s]atchel, as [Bufford] got up from the ground."  Doc. 79-3 at 98.  This was when Walls claimed he first saw a magazine, as Bufford was standing up and getting ready to run again (Walls Dep. 62:1-24).  Additionally, Plaintiffs provided evidence that the firearm attributed to Bufford was not registered to him and contained no fingerprints.  And Bauer opined as to mishandling of the evidence, including the bullets and subject gun, and that the subject gun had been dismantled and wiped clean (Doc. 79-3 at 94).

Further, although Roethlisberger asserts he could see clearly in the gangway despite failing to use his flashlight, testimony of other officers is contradictory.  Sack, who arrived on the scene after the shooting, testified as follows:

Q.    Okay. So the pathway between 535 and 533 Bates, what were the lighting conditions?

A.    It was dark. There was no light.

Q.    Was there a moon out that night?

18

A.     I don't recall that.

Q.     Were there any streetlights near?

A.     There are streetlights on Bates. I don't recall where it was in relation to these buildings, but I know that it was dark in – in the gangway.

Q.     Okay. Did you -- did you have to --you went into the gangway at some point.

A.     Yes, sir.

Q.     Okay. So you -- well, let me --we're going to have to break it down then.

A.     Sure.

Q.     Could you see your hand in front of your face?

A.     I had a flashlight, so I was --that -- if I didn't have a flashlight, I couldn't see clearly what was what.

Q.     Okay. Without a flashlight, you can't see clearly what's what?

A.     No, sir.

Q.     Okay. So -- and I'll break it down a little bit more. Without a flashlight, could you see your hand in front of your face?

A.     I -- I don't recall, but I know that it was dark.

Q.     Sure.

A.     Yeah, without a light, I couldn't.

Q.     Could you see six feet in front of you without a flashlight?

A.     Probably not.

Q.     Okay. Do you remember if any porch lights or house lights were on in either of those addresses?

A.     When I got there, I -- I don't remember for sure if either or both had one on or not.

Sack Dep. 88:2-89:16.

19

Walls also testified with respect to the limited visibility in the gangway:

Q.    All right. Let's talk about the scene right after the shooting.

You and Officer Roethlisberger are in front of the houses.

Did you proceed into the pathway between the houses?

A.    Yes.

Q.    What did you see?

A.    As I got closer, I saw a male laying on his stomach motionless.

. . .

Q.    How dark was it between those houses right there at that point?

A.    It was dark.

Q.    What does that mean?

A.    There was no light.

Q.    Could you see your hand in front of your face?

A.    Yes.

Q.    If you put your hand out in front of you, could you see your hand?

A.    Yeah. You, eventually, your eyes did adjust to the darkness in the gangway.

Q.    But it takes a moment?

A.    Yes.

Q.    Could you see the length of your body, five, six feet?

A.    I'm sorry.

Q.    I'm saying if you're standing in that gangway, could you see five or six feet in front of you?

A.    I don't remember.

Walls Dep. 99:3-101:16.

Plaintiffs also present highly relevant evidence that could support a jury determining

Bufford was not pointing a gun at Roethlisberger.  Roethlisberger testified as follows:

> A.     Yeah. I -- I -- I don't remember if I had my gun the whole time when I was chasing him, but I know that I pulled my gun in the direction of him when he was pointing the gun at -- when he was pointing his gun at me.
>
> Q.     Okay. And he -- at that point in time, you're face-to-face looking at each other, correct?
>
> A.     Yeah.
>
> Q.     Okay. Then what happened?
>
> A.     I thought he was going to kill me.
>
> Q.     Did you have any other thoughts in your mind at that time -- in that moment?
>
> A.     I was fearing for my life. I thought he was going to kill me.
>
> . . .
>
> Q.     Did he say anything?
>
> A.     No. It was so weird. He didn't say anything to me. He didn't say anything at all.
>
> Q.     And I have to ask: Did he have a certain expression on his face?
>
> A.     When?
>
> Q.     Right there. You -- you say he's got a gun pointed at you. You've drawn your weapon.
>
>        What was the expression on his face?
>
> A.     Like serious, angry.
>
> Q.     You've drawn your weapon. What happened?
>
> A.     I was fearing for my life. I shot.

Roethlisberger Dep. 136:19-138:6.  Roethlisberger also demonstrated Bufford's position at the

time of the shooting during a January 9, 2020 video interview with the SLMPD Force

Investigation Unit, as Plaintiffs' expert Bauer noted in his report, which included screen captures from the recording (Doc. 79-3 at 87).  Bauer conducted a ballistics study and wound mapping, from which he opined that "the evidence demonstrates that [Bufford] was NOT facing Officer Roethlisberger, as Officer Roethlisberger demonstrated during his January 9, 2020, interview, [] when the first two and last two bullets struck [Bufford].  Instead, [Bufford] was facing away from Officer Roethlisberger when Officer Roethlisberger first fired at [Bufford]."  (Doc. 79-3 at 89, 98).

Notably, the Eighth Circuit has determined that "a lack of eyewitness testimony is not a lack of evidence."  *Partridge v. City of Benton*, 70 F.4th 489, 491 (8th Cir. 2023).  Further, where an expert's testimony, "if believed, supports a reasonable inference that [the decedent] did not point his gun at the officers," "[t]hat suffices to survive summary judgment."  *Id.* at 492.  "To ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of the victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts."  *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020).  "The jury, not the Court, must weigh the conflicting evidence and make the credibility determinations and factual findings necessary to determine whether an officer in [Roethlisberger's] position could have reasonably but mistakenly, believed that [Bufford] posed an immediate threat of serious injury to officers or others."  *Ball-Bey v. Chandler*, No. 4:18-CV-1364-SPM, 2024 WL 5379123, at *11 (E.D. Mo. Aug. 23, 2024).  Defendants make no attempt to reconcile the discrepancies between Roethlisberger's account and Bauer's opinions.  Plaintiffs have produced evidence sufficient to create a genuine issue of fact regarding whether Bufford had a gun and whether Bufford was pointing a gun at Roethlisberger when he shot him.

Whether Roethlisberger had sufficient visibility in the gangway to have reasonably believed Bufford was pointing a gun at him, and whether Bufford in fact pointed a gun at Roethlisberger, are genuine disputes that are material since they are outcome determinative under prevailing law.  *See Ball-Bey*, 2024 WL 5379123, at *9.  Here, a jury could find that: (1) Bufford was not armed at the time of the shooting, (2) Roethlisberger could not see in the gangway and therefore could not have reasonably believed Bufford was pointing a gun at him, and (3) Bufford was not pointing a gun at Roethlisberger at the time Bufford was shot.  *See id.* (citing *Partridge*, 70 F.4th at 492); *Wealot v. Brooks*, 865 F.3d 1119, 1125-28 (8th Cir. 2017) (reversing district court's order granting summary judgment in officer's favor and finding genuine disputes of material fact as to whether the officers knew the suspect was unarmed and whether the suspect was turning around to face the officers with his hands raised to surrender, noting "[t]he officers' key testimony about the gun is controverted by other witnesses, some of their own inconsistent statements, and some physical evidence.").

Viewing the facts in the light most favorable to Plaintiffs, Bufford was fleeing, unarmed, and not pointing a gun at Roethlisberger when Roethlisberger shot him.  Under those facts, the Court finds that a reasonable officer in Roethlisberger's position would not have had probable cause to believe that Bufford posed an immediate threat of serious physical harm to Roethlisberger or anyone else, and therefore Roethlisberger's conduct violated Bufford's Fourth Amendment Rights.  *See Nance*, 586 F.3d at 610 ("The use of deadly force is not constitutionally unreasonable if an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.  But where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.") (citation modified).  Roethlisberger is not entitled to qualified immunity under the first prong of the test.

23

As to the second prong, the Court finds the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood his actions were unlawful.  "As the Eighth Circuit has noted, '[a]t least since *Garner* was decided [in 1985], officers have been on notice that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Ball-Bey*, 2024 WL 5379123, at *12 (quoting *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005)).  A previous case with the exact same factual issues is not required for a constitutional right to be clearly established.  *See id.*  The Court finds Roethlisberger is not entitled to qualified immunity on the excessive force claim.

### ii.  Unreasonable Seizure

#### (a)    Stop without reasonable suspicion or probable cause

Plaintiffs assert that according to the Officers' testimony, they decided to stop Bufford because he looked at the Tahoe after exiting the BP and walked away (Doc. 95 at 6).  Both Officers testified that Bufford stood outside the BP for a span of time, looked at or stared at their vehicle, and then walked away (*id.*).  Plaintiffs argue that this testimony does not support reasonable or articulable suspicion of criminal activity (*id.*).  Additionally, Plaintiffs argue that video surveillance shows Bufford exited the BP and walked around to the corner of the building without stopping and staring at the Tahoe (*id.* at 7).  Plaintiffs' police practices expert Chet Epperson ("Epperson") also opined that the Officers deviated from generally accepted national standards for police stops when they initiated their stop of Bufford (*id.*).  Based on all of this, Plaintiffs assert the Officers[7] lacked probable cause or reasonable suspicion to stop Bufford

---

[7] The Court notes that

"[t]o prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation." *White v. Jackson*, 865 F.3d 1064,

when they initiated their stop, violating Bufford's constitutional right to be free from unreasonable searches and seizures (*id.*).

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' and ensures that 'no Warrants shall issue, but upon probable cause.'" *Willis*, 141 F.4th at 911 (quoting U.S. Const. amend. IV).  For Plaintiffs' unlawful arrest claims to survive summary judgment, they must demonstrate both that Bufford "'was arrested without probable cause and that this violation was clearly established.'" *Id.* (quoting *Setchfield*, 109 F.4th at 1089).

"[A] person is seized within the meaning of the Fourth Amendment 'when the officer, by means of physical force or show of authority, terminates or restrains [the person's] freedom of movement.'" *United States v. Warren*, 984 F.3d 1301, 1303 (8th Cir. 2021) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)).  Plaintiffs object to the Officers' decision to follow Bufford in their vehicle based on the way he looked at their vehicle and then walked away. However, Plaintiffs present no evidence that Bufford's freedom of movement was limited or restrained in any way at that time or at any time before the Officers allegedly observed Bufford urinating in public.  "[T]here was no acquiescence with a show of authority." *Torres*, 39 F.4th 494 at 506; *see also Schulz v. Long*, 44 F.3d 643 647 (8th Cir. 1995).  Because Plaintiffs did not provide evidence that Bufford was seized before Roethlisberger exited his vehicle, no unreasonable seizure could have occurred at that point.  Defendants are entitled to summary judgment on this portion of their claim.

---

1081 (8th Cir. 2017). "An officer may be held liable only for his or her own use of excessive force." *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015).

*Torres v. City of St. Louis*, 39 F.4th 494, 504 (8th Cir. 2022).

**(b)** **Attempt to effectuate a warrantless arrest without probable cause**

Plaintiffs argue that, despite the Officers' contention they witnessed Bufford urinating in public, there was no forensic evidence to that effect and the Officers admitted Bufford could have been doing something else, such as looking at his phone, lighting a cigarette, or rifling through his satchel (Doc. 95 at 8).  Further, the Officers described their observations of Bufford allegedly urinating differently (*id.* at 9).  Based on this, Plaintiffs argue a jury could resolve the factual disputes such that, as a matter of law, the Officers would have lacked probable cause to arrest Bufford for an alleged ordinance violation (*id.* at 10).  Plaintiffs further argue that, based on other inconsistencies between Roethlisberger's testimony and other evidence, the jury should be left to decide whether the Officers' observations of urination were truthful, or merely a story to justify their unlawful pursuit of Bufford (*id.*).

For Plaintiffs' unlawful arrest claim to survive summary judgment, they must demonstrate both that Bufford "'was arrested without probable cause and that this violation was clearly established.'"  *Willis*, 141 F.4th at 911. (quoting *Setchfield*, 109 F.4th at 1089).  The probable cause analysis proceeds as follows:

> Probable cause exists "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011) (quoting *Fisher v. Wal–Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)). Requiring probable cause "is designed 'to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.'" *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 Led. 1879 (1949)).

> "To determine if there is probable cause, courts must 'examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Setchfield*, 109 F.4th at 1093 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). We are mindful that "[o]fficers

are given 'substantial latitude in interpreting and drawing inferences from factual circumstances.'" *Nieters v. Holtan*, 83 F.4th 1099, 1106 (8th Cir. 2023) (quoting *Bell*, 979 F.3d at 603), *cert. denied*, ―― U.S. ――, 144 S. Ct. 1349, 218 L.Ed.2d 424 (2024).

*Willis*, 141 F.4th at 911-12. Even if probable cause is lacking, "an officer is afforded the protection of qualified immunity 'if there is at least arguable probable cause.'" *Id.* at 912 (quoting *Hunt v. Acosta*, 109 F.4th 1003, 1007 (8th Cir. 2024)).

> "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Borgman*, 646 F.3d at 523 (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)). Thus, we review the totality of the circumstances and ask whether a reasonable officer could reasonably but mistakenly believe the arrestee committed a crime. *See Galanakis v. City of Newton*, 134 F.4th 998, 1003 (8th Cir. 2025).

*Id.* "The subjective intent of the officer is 'irrelevant to the existence of probable cause.'" *Id.* at 913 (quoting *Galanakis*, 134 F.4th at 1003).

Public urination in the City is an ordinance violation (Doc. 79 at 4). According to Roethlisberger's testimony, the Officers drove down the street and then turned around so that Roethlisberger's side of the vehicle was closer to Bufford (Roethlisberger Dep. 93:9-18). He stated that as they drove by Bufford and after turning their vehicle around, he saw Bufford "peeing in public" (*id*. at 93:25). Roethlisberger testified that he saw urine on the ground in the form of "a little puddle between his legs" but did not see exposed genitals, and that Bufford's hands were at his waist or groin area and his head was "kind of canted down a little bit" (*id.* at 94:6-97:9). Bufford's back was to Roethlisberger (*id.* at 97:21-23). Roethlisberger stated that, "once we saw that he's peeing in public, then it's not to do a field interview anymore"—at that point, "[h]e has broken the law" and Roethlisberger was going to "make an arrest" (*id.* at 95:18-96:9). Roethlisberger further testified that he did not believe Bufford was reaching for a lighter to light his cigarette or looking at his phone because Bufford's legs were "wide open" and his

hands were "in his groin area" and Roethlisberger could "see pee" (*id.* at 98:2-99:10).

Roethlisberger stated that he did not see "a stream" but saw "water" on the ground (*id.* at 99:18-25).

After the vehicle had made a complete turn and was facing north, Roethlisberger testified he said to Bufford "hey, man, put your junk away" to "get a reaction that what he is doing is breaking the law" and then "Mr. Bufford turned over his shoulder and he grinned" (*id.* at 100:3-10). Next, according to Roethlisberger,

A.   After that, he adjusted himself, like he's adjusting his pants or belt or whatever. In that movement, he turns around, and now he is facing me and Officer Walls. Now, I get a better look at what he is wearing. He's wearing a black puffy jacket. He's wearing a -- an orange, yellow sweatshirt, and then I see the satchel. Now I know it is a satchel. It's a strap that goes to a satchel. And I see his black pants.

As that is all going at the same time -- now, mind you, his actions are going at the same time as -- as I'm saying them, and he's facing me. I see that he's looking -- knowing that we – we've already told him that, hey, man, we already caught you peeing -- peeing in public, and he looks at me, turns left, turns right and then –

Q.   Turns his head or turns his body?

A.   Turns -- turns his head.

Q.    Okay.

A.   Turns left, turns right, pulls up his pants; and at the same time as me, I'm going to get out of the vehicle, I say, hey, man, let me talk to you. As soon as I'm saying that, Mr. Bufford started running.

Q.   Just about the time you're getting out of the vehicle.

A.   Yes.

Q.   Okay.

A.   Okay. And then -- again, we're facing north -- I get out of my patrol vehicle and Mr. Bufford runs in a northwest direction. As that's going on, he turns around the shoulder, he's looking at me on his right side, looking

> at me, so like focusing very hard. Marty was driving, I guess, going north, and Mr. Bufford ran right into our patrol car.

*Id.* at 100:14-101:25.

Walls testified as follows.  He stated that officers can attempt to talk to someone who has not committed a violation, and a person would be free to leave without talking to them (Walls Dep. 53:18-54:3).  Here though, Walls thought that Bufford was urinating in public in violation of a City ordinance, and that Bufford would have been "summoned or cited for urinating in public" and patted down after being "placed in handcuffs for urinating in public" (*id.* at 56:4-9). Walls affirmed that was the Officers' intent that night based on their belief that Bufford was urinating (*id.* at 56:10-13).  Walls stated he knew Bufford was not just facing the wall to get out of the wind and light a cigarette because "[b]oth hands were in front of his pants, close to where his zipper and waistband would be," "[h]is hands weren't moving," and "[h]is legs were spread unnaturally for a stand" (*id.* at 56:14-19).  Walls did not believe Bufford was just looking at his phone because "[i]t's not common, from my belief, that people look at cell phones that way" (*id.* at 56:20-23).  While admitting people can hold cell phones down near their waist, Walls stated "[p]eople also don't have their back face toward the street, up close by a corner of a building looking at their cell phone, typically" (*id.* at 56:24-57:6).  Walls admitted it was "possible" Bufford could have been trying to get something out of his bag or reaching for a cigarette lighter (*id.* at 57:7-18).  When asked whether he thought there was probable cause for an arrest such that he would have had to stop Bufford when he ran, Walls explained:

> As we drove south on Virginia we noticed him in the stance, with his legs spread apart unnaturally, and his hands in front of his groin area, close towards the building.  We believed that he was urinating in public, so we conducted a U-turn.
> As I pulled alongside of him, Officer Roethlisberger rolls down his window and says, "Hey man," in a light-hearted, joking, "put your junk away."

> At that point I would have exited the vehicle if I was in the passenger seat, and detained him for urinating in public, and at minimum, wrote him a summons.

(*id*. at 57:19-58:8).

Plaintiffs argue that the jury should be left to decide whether the Officers' "story of having observed Cortez urinate in public is just that – a story to justify their unlawful pursuit of Cortez and unlawful use of deadly force against him" (Doc. 95 at 10).  Plaintiffs essentially argue this is a credibility issue for the jury.  Plaintiffs point to a post-incident scene investigation conducted by Detective Chaney revealing no physical sign of urination at the scene.  Plaintiffs also cite inconsistencies in the Officers' testimony.  When asked if he saw Bufford urinating, Walls stated he was looking at Bufford's *upper* body.  Roethlisberger claimed to see a puddle, which he called *water*.  And Walls testified Bufford's pants were already adjusted when Bufford turned around, but Roethlisberger claimed Bufford turned around, faced the Officers, and then pulled up his pants.  Walls testified "[a]s his back was towards us, he began to adjust himself" and "[when h]e turned around … he was fully adjusted [and] kind of smirked, or smiled at us," at which point Roethlisberger opened his door (Walls Dep. 48:11-19).  Roethlisberger testified that after he yelled "put your junk away," "Bufford turned over his shoulder and he grinned" (Roethlisberger Dep. 100: 7-10).  Roethlisberger further testified "[a]fter that, he adjusted himself, like he's adjusting his pants or belt or whatever." (*id.* at 100:14-17).

Plaintiffs attack Roethlisberger's credibility on other points as well: the video surveillance which refutes Roethlisberger's statement that Bufford stopped and stared at the Officers when Bufford exited the BP; the forensic evidence showing no one fired or attempted to fire the weapon attributed to Bufford, which refutes Roethlisberger's statement that he believed Bufford was shooting at him; and the fact that Roethlisberger unholstered his gun and pointed it at Bufford when he initially fled, prior to any alleged sighting of the firearm (Doc. 95 at 10).

"The Supreme Court has repeatedly emphasized 'that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.'" *New v. Denver*, 787 F.3d 895, 900 (8th Cir. 2015) (quoting *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)). "Thus, the Court has held, an arrest that is based upon sufficient probable cause does not violate the Fourth Amendment because the arresting officer did not correctly identify the law being violated, or because he made a pretextual arrest for another law enforcement purpose." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 812–13 (1996) (collecting cases)).

In *New*, the Eighth Circuit analyzed the district court's conclusion that an officer's credibility was a disputed issue of material fact based on contrary evidence, namely, a lab result and contrary statements by the plaintiff. *New*, 787 F.3d at 900. The Eighth Circuit determined that the "contrary evidence" noted by the district court was not "alone or in combination, material to the question of arguable probable cause." *Id*. Here, the "contrary evidence" that no physical evidence of urine was found at the scene is not material to the question of arguable probable cause "[b]ecause the Constitution 'does not guarantee that only the guilty will be arrested.'" *Id.* (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). Hindsight evidence is irrelevant to the analysis:

> "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152, 125 S.Ct. 588; *see Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 n.5 (8th Cir.) (inconsistent information developed after an arrest "is irrelevant to our probable cause analysis"), *cert. denied,* 519 U.S. 867, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996).

*Id.* at 901.

Finally, "[i]n a § 1983 action alleging a violation based on lack of probable cause, qualified immunity applies unless Plaintiffs demonstrate the Officers 'did not have arguable probable cause to arrest, the governing Fourth [A]mendment standard.'" *Johnson v. Moody*, No.

416CV00449RGESBJ, 2017 WL 2903351, at *5 (S.D. Iowa June 15, 2017) (quoting *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016)) (citation modified), *aff'd*, 903 F.3d 766 (8th Cir. 2018). The court in *Johnson* determined that a material fact dispute was not created by a lack of additional investigation plaintiffs wished the officers had done, or by inconsistent statements of a witness, but that plaintiffs had to show "specific facts" demonstrating the officers lacked probable cause. *Id*. Plaintiffs here have not met this burden.

The Officers had at least arguable probable cause to arrest Bufford for public urination, and Plaintiffs have failed to provide specific facts that arguable probable cause was lacking. Defendants are entitled to summary judgment on this portion of their claim.

### iii.  Walls' Use of Force

#### (a)    The Tahoe

Defendants argue Walls is entitled to qualified immunity on the excessive force claim because the evidence shows he did not use force against Bufford and his actions did not violate clearly established law (Doc. 83 at 11). Defendants also argue that to the extent Plaintiffs bring this claim for Walls' use of the Tahoe, Plaintiffs cannot provide competent evidence showing Walls used force of any kind on Bufford (*id*. at 15). Defendants argue "the evidence shows that Officer Walls maneuvered his vehicle such that the vehicle blocked Bufford's avenue of escape," and that "Bufford ran into the front passenger quarter panel and fell down, distracted by Officer Roethlisberger's foot pursuit" (*id*.). Defendants further argue that there are no cases establishing that Walls' actions using the Tahoe violates clearly established law (*id*.).

Plaintiffs respond that Walls operated the Tahoe in a manner with a known risk to Bufford, who was a nonviolent, nonthreatening, fleeing individual that was allegedly suspected of an ordinance violation, and his use of force via the Tahoe was clearly excessive (*id* at 15). Plaintiffs also argue that Sack testified the maneuver used by Walls with the Tahoe was risky and

32

improper (*id*.).  Plaintiffs do not address the clearly established prong of the qualified immunity analysis with respect to this claim.

In their Reply, Defendants reiterate that undisputed evidence indicates Walls positioned the Tahoe in front of Bufford, and Bufford ran into the vehicle because he was distracted (Doc. 96 at 4).  Under these circumstances, Defendants argue, Walls did not apply force to Bufford by moving the Tahoe in Bufford's path and Plaintiffs cannot establish an unconstitutional seizure or excessive force on this basis (*id*. at 4-5).

"An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."  *California v. Hodari D*., 499 U.S. 621, 626 (1991).  In *Hodari*, the Supreme Court determined even where there is a "show of authority" via a pursuit, seizure did not occur until the individual was tackled.  *Id.* at 629.  However, "application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  *Torres v. Madrid*, 592 U.S. 306, 325, 141 S. Ct. 989, 1003, 209 L. Ed. 2d 190 (2021).

Here, Plaintiffs' allegations that Walls moved the Tahoe in a risky manner does not equate to an application of force.  Despite Sack's description of Walls' use of the vehicle as risky and improper, and the fact that impact occurred, Plaintiffs have not shown that force was *applied*.  Further, even if the movement of the Tahoe could be considered a "show of authority," Bufford did not submit, but kept running, and therefore no seizure occurred at this juncture.

Further, because Walls asserts he is entitled to qualified immunity, Plaintiffs have the burden to prove both of the following: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).  Even assuming Plaintiff met the first element of establishing a

constitutional deprivation, Plaintiffs have not shown that Walls' "risky and improper" use of the Tahoe to block Bufford's path on foot and resulting in an impact violates a clearly established constitutional right.  Accordingly, Walls is entitled to qualified immunity on this claim.

### (b)        Failure to Intervene

To the extent Plaintiffs raise a claim of failure to intervene under § 1983, Defendants argue Walls is entitled to qualified immunity on this claim on three bases: (1) Roethlisberger's use of force was objectively reasonable and not excessive, (2) Walls was not physically present when force was used, did not observe force being used, know that force was used, or have the opportunity or means to prevent force from being used; and (3) it was not clearly established he had a duty to intervene when he merely saw Roethlisberger pursuing Bufford with his firearm drawn (Doc. 83 at 10-11).  It is undisputed Walls was not physically present in the gangway when Roethlisberger used deadly force on Bufford (*id*. at 12).

With respect to the "clearly established law" prong, Defendants argue Plaintiffs cannot meet the burden of setting forth cases of controlling authority, or a robust consensus of persuasive cases such that a reasonable officer could not have believed his actions were lawful (*id*. at 14).

Plaintiffs respond that Walls was present at the outset of the pursuit, when Roethlisberger drew his gun and pointed it at Bufford before they allegedly observed a gun in Bufford's satchel (Doc. 95 at 16).  Based on this, Plaintiffs assert Walls knew of Roethlisberger's intent to use deadly force and Walls had an opportunity to intervene prior to the shooting (*id.*).  Plaintiffs do not respond to Defendants' argument regarding their failure to meet their burden with respect to the clearly established prong.

In their Reply, Defendants argue Walls testified he was not aware when Roethlisberger unholstered his weapon, only that he saw him pursue Bufford down Bates with the firearm drawn

34

(Doc. 96 at 5).  Further, they argue there is no evidence in the record that Walls, who was focused on a fleeing suspect possessing a firearm, knew or should have known that Roethlisberger's actions were unconstitutional or required intervention (*id.*).

"[A] police officer may be liable if he does not intervene to prevent the use of excessive force when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015).  "Typically, the claim is brought against someone who was physically present for an act of excessive force."  *Sarich v. Missouri*, No. 4:23-CV-00943-SEP, 2025 WL 901276, at *4 (E.D. Mo. Mar. 25, 2025) (collecting cases).

Here, Walls was not present in the gangway when Roethlisberger shot Bufford, but was driving the police Tahoe in a nearby alley.  To the extent Plaintiffs claim Walls had a duty to intervene when Roethlisberger initially drew his gun at the outset of the foot pursuit, Plaintiffs have not met either prong of a failure to intervene claim.  Walls testified he did not know when Roethlisberger unholstered his weapon, and it is undisputed that Walls was driving a vehicle and assisting in pursuit of a fleeing suspect in a rapidly evolving situation.  Plaintiffs have not established Walls observed or had reason to know excessive force would be used, nor that Walls had the opportunity and the means to prevent harm from occurring.

Further, with respect to qualified immunity, Plaintiffs have failed to cite any cases where an officer has been held liable for failure to intervene despite not being physically present at the scene of the other officer's use of force.  *See Sarich*, 2025 WL 901276, at *5.  Walls is entitled to qualified immunity as to the failure to intervene claim.

2. **Counts II, III, V, and VI: State Law Wrongful Death and Survival Action Claims Against Roethlisberger and Walls**

In Counts II and V, Plaintiffs bring Wrongful Death claims pursuant to Mo. Rev. Stat. § 537.080.1(1) against the Officers in their individual capacities.  In Counts III and VI, Plaintiffs bring Survivor Action claims pursuant to Mo. Rev. Stat. § 537.020 *et. seq*. against the Officers in their individual capacities.  Defendants move for summary judgment on these counts, asserting Roethlisberger and Walls are entitled to official immunity as to each (Doc. 83 at 15).

Plaintiffs respond that forensic evidence showing Roethlisberger's first shot struck Bufford in the back and that the firearm attributed to Bufford had not been fired nor had it been attempted to be fired, provide bases for a jury to reasonably conclude that Roethlisberger's conduct was a wanton and willful disregard of Bufford's rights or was the result of malice, corruption, or improper or wrongful motive (Doc. 95 at 18).  Plaintiffs argue that the Officers lacked probable cause to arrest Bufford, Roethlisberger began using deadly force without probable cause to do so and prior to any alleged observation of a weapon, and Roethlisberger's testimony is directly disputed by physical evidence (*id*.).  According to Plaintiffs, these factors show potential bad faith or malice on the part of the Officers (*id*.).

Plaintiffs note that this court has previously denied summary judgment based on official immunity for a false arrest claim where the arresting officer did not have probable cause (*id*.). Plaintiffs also assert that official immunity does not apply to police officers responding to non-emergencies, and here, an attempted arrest of a suspect for an ordinance violation is not an emergency, nor is an attempt to arrest a fleeing suspect who is suspected of an ordinance violation (*id*. at 20).  Plaintiffs argue that the Officers did not have reasonable suspicion to stop Bufford, were without probable cause to arrest Bufford, engaged in pursuit, used disproportionate force against Bufford, and unduly escalated the situation, thereby acting without

36

legal basis and exceeding their legitimate authority (*id*.).  Having exceeded their legitimate authority, the Officers are not entitled to official immunity (*id*.).  Plaintiffs state there are questions of fact a jury must decide prior to the legal determination of probable cause and use of force, and Defendants' motion for summary judgment should be denied (*id*.).

In their Reply, Defendants assert that Plaintiffs focus on challenges to the factual record that Roethlisberger and Walls observed Bufford urinating in public, that Bufford fled, that the Officers observed a firearm in Bufford's satchel, and that Bufford raised a firearm at Roethlisberger (Doc. 96 at 6).  Defendants note that Plaintiffs cite no caselaw indicating Roethlisberger should not be entitled to official immunity (*id*.).  With respect to Walls, Defendants assert that arresting a suspect, including using a vehicle in pursuit of a fleeing suspect, is a discretionary act, entitling Walls to official immunity (*id.*).  Defendants also assert that Plaintiffs' argument that an attempt to effectuate an arrest of a resisting or fleeing individual suspected of an ordinance violation is not an emergency entitling Walls to official immunity is "clearly false" under Missouri law (*id*.).  Defendants claim it makes no difference that Bufford was suspected of committing a misdemeanor ordinance violation and not a serious crime (*id*.).

### a.    Official Immunity Standard

"Under Missouri law, official immunity 'protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'" *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 629 (8th Cir. 2021) (quoting *State ex rel. Helms v. Rathert*, 624 S.W.3d 159, 163 (Mo. banc 2021)).  Official immunity is broadly applied to serve its purpose of allowing "public officials to make judgments affecting the public safety and welfare without [t]he fear of personal liability." *Id.* (quoting *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. banc 2019)).  Further:

> "It is generally held that official immunity applies to all discretionary acts except those done in bad faith or with malice." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. 1986). Official immunity is "unavailable to an officer who acts 'in bad faith or with malice,' where malice is defined to include 'reckless indifference to the rights of others.'" *Estate of Snyder v. Julian*, 789 F.3d 883, 887 (8th Cir. 2015) (quoting *Twiehaus*, 706 S.W.2d at 446-47). "[A] bad-faith allegation survives summary judgment if a plaintiff states 'facts from which it could reasonably be inferred that [defendant] acted in bad faith or from an improper or wrongful motive.'" *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 841 (quoting *Twiehaus*, 706 S.W.2d at 447-48). "If a plaintiff presents evidence that an officer engaged in 'conscious wrongdoing,' a court denies summary judgment to the defendant-officer." *Id.* (quoting *Blue v. Harrah's N. Kan. City, LLC*, 170 S.W.3d 466, 479-80 (Mo. Ct. App. 2005)).

*Ball-Bey*, 2024 WL 5379123, at *14.  "An officer's 'decision to arrest someone' and 'decision to use force in the performance of his duties' both are discretionary acts."  *T.K. by Gagnon v. Cleveland*, No. 2:19-CV-04100-NKL, 2020 WL 3947276, at *21 (W.D. Mo. July 10, 2020) (quoting *Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017)).  Official immunity applies to both intentional and negligent acts.  *Id.*

Viewing the evidence in the light most favorable to Plaintiffs, that Roethlisberger fired at an unarmed, fleeing Bufford, needlessly, the Court can reasonably infer Roethlisberger acted with reckless indifference to the rights of others and engaged in conscious wrongdoing.  Because an inference of bad faith can be made based on the evidence presented by Plaintiffs, Roethlisberger is not entitled to official immunity at this stage.  *See Ball-Bey*, 2024 WL 5379123, at *15 (refusing to grant official immunity to defendant-officer at the summary judgment stage in accordance with the Eighth Circuit opinion in *Estate of Snyder v. Julian*, 789 F.3d 883 (8th Cir. 2015).  In *Snyder*, the court determined that a parole officer who shot and killed a parolee while arresting him was not entitled to official immunity because despite the officer's assertions that the shooting was a discretionary, split-section decision, there was evidence sufficient to support a finding that [the officer] acted with reckless indifference to [the

parolee's rights], namely, evidence that the parolee was unarmed, running away from the officer, and posed no threat when the officer shot him).  Roethlisberger is not entitled to official immunity on Counts II or III at the summary judgment stage.

Walls, however, is entitled to official immunity as to the Wrongful Death and Survivor claims.  Walls' alleged failure to intervene and use of the Tahoe were discretionary decisions lacking malice.  "An officer acts with malice or bad faith 'when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.'"  *T.K.*, 2020 WL 3947276 at *21 (quoting *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. 1986); *see also Boude*, 855 F.3d at 935 ("Bad faith means dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of fraud." (internal quotations omitted)).  Plaintiffs did not present any specific evidence of bad faith, nor can the Court infer bad faith from the facts.  *See id*.; *see also Boude*, 855 F.3d at 935 (conclusory allegations of bad faith are insufficient to defeat summary judgment).   Walls is entitled to official immunity on Counts V and VI.

### 3.  Counts VII and VIII: Municipal Liability Pursuant to 42 U.S.C. § 1983; and Counts XII and XIII: § 1983 Claims Against Lieutenant Colonel Sack in His Official Capacity

In Count VII, Plaintiffs allege a municipal liability claim against the City pursuant to § 1983 for tolerating, permitting, failing to correct, promoting, or ratifying a custom, pattern, and practice of City of St. Louis Police Officers who engage in unjustified, unreasonable, and illegal use of excessive force, including deadly force (Doc. 1 at 26).  In Count VIII, Plaintiffs allege a municipal liability claim against the City pursuant to § 1983 for having a custom or policy of negligently hiring and retaining officers, failing to properly train or supervise officers in the use of deadly force in areas of the City of St. Louis predominately populated by African Americans,

and failing to conduct fair and impartial investigations (*id.* at 27-29). In Counts XII and XIII, Plaintiffs bring identical claims against Sack in his official capacity.

Defendants first argue that the § 1983 claims against Sack in his official capacity are duplicative to the claims against the City and should be dismissed (Doc. 83 at 18). In their Response, Plaintiffs do not dispute this (Doc. 95). It is apparent the claims against Sack are duplicative of those against the City and Counts XII and XIII are **DISMISSED.** *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) ("[a] suit against a public employee in his or her official capacity is merely a suit against the public employer."); *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) ("A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity."); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.") (modified)).

Defendants seek summary judgment on Counts VII and VIII, arguing Plaintiffs are unable to provide evidence suggesting their injuries were caused by an unconstitutional City policy or custom. Plaintiffs respond that the evidence shows a persistent pattern of deliberate indifference to a policy or unofficial custom that is so widespread as to have the force of law (Doc. 95 at 22). Their argument is almost entirely based on Roth's testimony that the circuit attorney determined she was not going to review police shooting cases or simply took no action on them (*id.*). Plaintiffs assert a jury could reasonably conclude that the City was deliberately indifferent to the circuit attorney's alleged policy, and the subsequent policy or unofficial custom that resulted in officers being permitted to use excessive force without consequences (*id.*). Finally, Plaintiffs argue a jury could reasonably conclude that the policy or custom was so persistent and widespread as to have the force of law and find the City liable (*id.*)

40

In their Reply, Defendants argue that Plaintiffs misstate elements of their claims, and that the circuit attorney's decision not to review or prosecute officer-involved shootings alone is not enough to prove their claims (Doc. 96 at 7).

### a. *Monell* Liability Standard

"Section 1983 provides a cause of action against any 'person' who, acting 'under color of' state law, deprives the plaintiff of 'rights, privileges, or immunities secured by the Constitution' or granted by federal statute." *Danielson v. Huether*, 355 F.Supp.3d 849, 858 (D.S.D. 2018). A municipality is a "person" under § 1983, but "cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007). "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' *Monell,* 436 U.S. at 691, 98 S.Ct. 2018; (2) an unofficial 'custom,' *id.* at 690–91, 98 S.Ct. 2018; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). *Monell* and its progeny have set out the contours and limits of this type of suit:

> The Supreme Court has set a high bar for establishing municipal liability under § 1983, and demands careful analysis from district courts, to avoid any risk that liability could be imposed under a theory of respondeat superior. *See Pembaur*, 475 U.S. at 479, 106 S.Ct. 1292. A municipality bears responsibility for its own torts, not the torts of its employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[I]t is when execution of a government's policy[,] ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018.

*Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017). "Liability under § 1983 for a governmental entity must be based upon an official custom, policy, or practice of the city

that causes the deprivation." *Palmore*, 851 F.Supp.2d at 1174 (citing *Monell*, 436 U.S. at 690-94). A municipal policy or custom can be established as follows:

> Broadly speaking, courts have found a policy or custom when the alleged unconstitutional action was taken by the municipality's legislative body, *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); when a widespread practice exists that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) (cleaned up); or when the municipal employee who took the allegedly unconstitutional action has "final policymaking authority" as to "the subject matter in question," *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292 (plurality opinion).

*Danielson*, 355 F.Supp.3d at 871. Finally, the municipal policy or custom must be the "moving force" behind the alleged injury:

> A municipality is not liable under § 1983 unless there is "a direct causal link between" the municipal policy or custom and the plaintiff's constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (explaining that the plaintiff must show that the municipality, "through its *deliberate* conduct, ... was the 'moving force' behind the injury alleged"). Moreover, "there must be an unconstitutional act by a municipal employee before a municipality can be held liable," although "there need not be a finding that a municipal employee is liable in his or her individual capacity." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (cleaned up).

*Id.* at 872.

An unwritten or *de facto* policy is "evaluated under the standards used to analyze the sufficiency of a *Monell* custom claim." *Lollie v. Johnson*, No. 14-CV-4784 (SRN/HB), 2015 WL 3407931, at *4 (D.Minn. May 27, 2015). To demonstrate a municipal custom exists, Plaintiffs must allege the following three elements:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2)

Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, *i.e.,* proof that the custom was the moving force behind the constitutional violation.

*Id.* at *5 (modified) (citing *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)).

In the case at bar, the circuit attorney's action or inaction as to excessive force cases cannot plausibly be the "moving force" behind the alleged constitutional violation. *See Lollie*, 2015 WL 3407931 at *6. The court in *Lollie* illuminated the fault in similar post-injury arguments:

the Court notes that insofar as Plaintiff argues that a municipal custom was created by the City's failure to investigate and discipline the allegedly culpable officers in this case, the Court holds that Plaintiff does not plausibly allege that the City's custom was the "moving force" behind the alleged constitutional violations that took place on January 31, 2014. As Defendants correctly explain, "[p]ost-injury wrongful conduct cannot be the moving force behind the injury at issue." (*See* Defs.' Resp. at 8 [Doc. No. 18] ); *Mettler*, 165 F.3d at 1205 (explaining that in order to state a plausible *Monell* custom claim, the plaintiff would need to show that the defendant "failed to investigate previous incidents before a court could conclude the deputies at the time of the shooting believed a municipal custom allowed them to violate [the victim's] rights with impunity."); *see also Fancher v. Klann,* No. 13–CV–435 (DSD/JJK), 2014 WL 4294960, at *4 (D. Minn. Aug 18, 2014) (holding that a subsequent Internal Affairs investigation cannot be the moving force for the incident that precipitated the investigation); *Tompkins v. Frost,* 655 F.Supp. 468, 472 (E.D.Mich. 1987) (stating that "[w]rongful conduct after an injury cannot be the proximate cause of the same injury"). Therefore, Plaintiff also fails to plausibly allege facts relevant to the third element in a *Monell* custom claim. *See Ware,* 150 F.3d at 880 (requiring a plaintiff to show that the municipality's custom was the "moving force" behind the constitutional violation).

*Id.* Here, Plaintiffs have not set forth allegations of incidents of excessive force which occurred before the incident here that were not investigated.[8]

---

[8] Notably, the *Lollie* court recognized "that the Eighth Circuit has not expressly recognized a post-incident ratification theory under *Monell*," though other circuits have in limited factual situations described as "extreme" or where there is "something more than a single failure to discipline or the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Id.* at *7 (internal quotations

### b. *Monell* Claims Related to Officer Conduct

Defendants assert that because the Officers are entitled to qualified immunity on the Fourth Amendment related claims and individual liability was not established, the related claims against the municipality must fail (Doc. 83 at 20).  The Court previously determined that Roethlisberger is not entitled to qualified immunity on the excessive force claim.

Further, Defendants argue that Plaintiffs cannot point to any City custom or policy which directly resulted in the alleged injuries (*id*).  Defendants also assert that Plaintiffs' arguments that the City failed to promulgate official policies that would have prevented either officer's alleged use of excessive force is deficient because the Eighth Circuit has specifically held a municipality cannot be held liable for the same (*id*. at 21).

Defendants additionally assert Plaintiffs cannot establish the City had an unconstitutional custom of permitting their officers to use excessive force (*id*. at 22).  Finally, Defendants argue that where constitutional rights alleged to be violated were not clearly established, *Monell* liability under § 1983 does not attach (*id*.).

Plaintiffs respond that they have established evidence of a custom or policy that caused a constitutional injury, namely, the circuit attorney's policy not to review, or taking no action on, police shooting cases (Doc. 95 at 22-23).  Plaintiffs ask the Court to take judicial notice that Kimberly Gardner occupied the office of the City's circuit attorney from January 1, 2017 to May 16, 2023 (*id*. at 23).  Plaintiffs assert a jury could reasonably conclude that the City was deliberately indifferent to the circuit attorney's policy and the subsequent policy or unofficial custom that resulted in officers being permitted to use excessive force without consequences

---

omitted).    Additionally, "even if the Eighth Circuit ultimately recognizes post-incident ratification *Monell* claims," Plaintiff has not set forth evidence of other failures to investigate excessive force cases.  *See id*. ("The failure of policymakers to discipline subordinates after one isolated incident, and publicly report their findings from that incident, is not an adequate basis

(*id.*).  Plaintiffs argue the City perpetuated a policy or unofficial custom that a police officer need not fulfill his duty to intervene in the violation of a citizen's constitutional rights (*id.*).  Finally, Plaintiffs argue a jury could reasonably conclude that the SLMPD's written use of force policies were forceless, and that this policy or custom was so persistent and widespread as to have the force of law and find the City liable (*id.*).

In their Reply, Defendants argue Plaintiffs have failed to point to even one other example where, under similar circumstances, deadly force was used against a suspect; have presented no evidence that the City was on notice that SLMPD officers were continuously using excessive force; or that the City knew about it and deliberately chose to take no corrective action (Doc. 96 at 8).  Finally, even if the circuit attorney was not pursuing criminal cases against officers, a discretionary decision, there is no evidence that any officer was aware of the custom and that the custom was the moving force behind their alleged unconstitutional activity (*id.*).

To the extent Plaintiffs argue the City is liable for failing to promulgate policies that would have prevented Plaintiffs' constitutional violation, this argument fails as a matter of law.  "As we made clear in *Szabla,* a municipality may not be held liable under § 1983 merely because it 'failed to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion.'"  *Atkinson*, 709 F.3d at 1216 (quoting *Szabla*, 486 F.3d at 395)).  Further, "[n]otice is the touchstone of deliberate indifference in the context of § 1983 municipal liability," and where plaintiffs submit no evidence of excessive force by city police officers other than the incident at issue, "no reasonable jury could find the city had notice that its lack of written use-of-force policies was likely to result in a constitutional violation."  *Id.* As a result, "the city's failure to adopt such policies does not create a genuine dispute of material fact."  *Id.*

---

for municipal liability under *Monell*.").

To the extent Plaintiffs argue the City was deliberately indifferent to the circuit attorney's policy of not reviewing police shooting cases, the Court agrees with Defendants that Plaintiffs have not shown that the alleged policy was the moving force behind any alleged constitutional violations.  Plaintiffs have presented no evidence that any officer was aware of the circuit attorney's alleged policy.

Plaintiffs also fail to provide any evidence of the resulting "policy or unofficial custom" of officers using excessive force without consequences, as the only incident discussed is the one involving Bufford.  Based on this single incident related to Plaintiffs' experience alone, Plaintiffs have not sufficiently shown an unconstitutional custom.  *See Bolderson v. City of Wentzville, Mo.*, 840 F.3d 982, 986 (8th Cir. 2016) ("To trigger municipal liability based on unofficial municipal custom, the custom must be so pervasive among non-policymaking employees of the municipality that it effectively has the force of law."); *see also Quinn v. Doherty*, 637 F.Supp.3d 647, 667 (D.Minn. 2022) ("Plaintiffs' specific allegations relate only to Plaintiffs' experience.  This isolated event does not establish a custom.").

### c.  *Monell* Claims for Failure to Train and Failure to Supervise

Defendants argue Plaintiffs cannot establish their failure to train or failure to supervise claims against the City (Doc. 83 at 24).  Defendants assert that the evidence indicates Roethlisberger and Walls received training on proper use of force at the SLMPD Academy and continuing education courses (*id*. at 25).  Further, they assert Plaintiffs cannot provide evidence that the City was on notice that its police officers were unconstitutionally using excessive force or failing to intervene with such frequency to require an alteration to the current use of force, intervention, supervision, or training policies relevant here (*id*.).

Plaintiffs respond that Defendants motion for summary judgment should be denied for the following reasons.  The City's circuit attorney had a policy or unofficial custom of

46

perpetuating excessive force used by officers and acted with deliberate indifference to all officer-involved shootings, and the City's corporate representative, Roth, testified he was aware of this policy (Doc. 95 at 24).  Plaintiffs assert the City failed to institute any other supervision of or means for instituting meaningful consequences on those officers who use excessive force, nor did the City otherwise correct the circuit attorney's course of action (*id.*).  Plaintiffs also assert their expert, Epperson, testified that Sack failed to adequately supervise Roethlisberger and Walls when he failed to fully and thoroughly assess their conduct during the incident with Bufford (*id.* at 25).

In their Reply, Defendants assert Plaintiffs have provided no evidence supporting these claims, despite the requirement for Plaintiffs to show that the municipality received notice of a pattern of unconstitutional acts committed by its employees, and no evidence that the City was on notice that its police officers were using excessive force or failing to intervene with such frequency to require alteration to the current policies (Doc. 96 at 13).  Defendants assert Plaintiffs have also failed to show the Officers were inadequately trained or supervised (*id.*).

"It is well-established that § 1983 claims based on the City's alleged deficient hiring or failure to train and supervise its employees require proof that: (1) the City's practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting them, such that the failure to hire, train, or supervise reflects a deliberate or conscious choice by the City; and (3) an alleged deficiency in the hiring, training, or supervising procedures actually caused the plaintiff's injury."  *Glasper v. City of Hughes, Arkansas*, 269 F. Supp. 3d 875, 901 (E.D. Ark. 2017) (citing B.A.B*., Jr. v. Bd. of Educ. of City of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012)).  For a failure to train or failure to supervise claim to succeed, there must be "evidence the municipality 'received notice of a pattern of unconstitutional acts committed by [its

47

employees].'"  *Atkinson*, 709 F.3d at 1216-1217 (quoting *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010)).  Furthermore,

> When governmental policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the governmental entity may be deemed deliberately indifferent if the policymakers choose to retain that program. *Brown*, 520 U.S. at 407, 117 S.Ct. 1382. The governmental entity's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [governmental entity] itself to violate the Constitution.'" *Connick*, 563 U.S. at 60, 131 S.Ct. 1350 (quoting *Harris*, 489 U.S. at 395, 109 S.Ct. 1197 (O'Connor, J. concurring in part and dissenting in part)). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62, 131 S.Ct. 1350.

*Ball-Bey v. Chandler*, 415 F. Supp. 3d 884, 900 (E.D. Mo. 2019).  "Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness."  *Glasper*, 269 F. Supp. 3d at 901.

Plaintiffs present no evidence beyond mere allegations that prior to the incident giving rise to this case, the City's training or supervision of the Officers was inadequate.  Plaintiffs present no evidence that the City had actual or constructive notice of a pattern of unconstitutional acts of its employees, and without notice, "the city cannot be deliberately indifferent to the risk that its training or supervision of [the Officers] would result in a 'violation of a particular constitutional or statutory right.'"  *Atkinson*, 709 F.3d at 1217 (quoting *Bd. of Cnty. Comrs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 411 (1997)).  Without facts to demonstrate a genuine issue for trial, Plaintiffs' mere allegations cannot defeat summary judgment.  *See Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir. 2007).

### d. *Monell* Claims for Failure to Hire or Retain

Defendants assert summary judgment should be granted on Plaintiffs' failure to hire or retain claim because Plaintiffs present no evidence the City improperly hired Roethlisberger or Walls, that there was a risk these officers would inflict this particular constitutional injury, or that either officer had a history of constitutional misconduct that would put the City on notice sufficient to justify a negligent retention claim (Doc. 83 at 26).

Plaintiffs respond that Epperson's expert opinion shows Sack failed to adequately supervise Roethlisberger and Walls by failing to fully and thoroughly assess their conduct during the incident, and that proper investigation or supervision of Roethlisberger "should have resulted in adverse action against Roethlisberger, such that an employment decision should have been made for non-retention" (Doc. 95 at 26). Plaintiffs argue Defendant's motion for summary judgment should be denied on this basis (*id.*).

In accordance with the relevant standard set forth above, Plaintiffs must present evidence that "(1) the City's practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting them, such that the failure to hire, train, or supervise reflects a deliberate or conscious choice by the City; and (3) an alleged deficiency in the hiring, training, or supervising procedures actually caused the plaintiff's injury." *Glasper*, 269 F. Supp. 3d at 901.

Plaintiffs' arguments that Roethlisberger should have been fired because of a proper investigation of this incident do not pass muster. A failure to fire Roethlisberger could not have *caused* Plaintiffs' injuries. Further, Plaintiffs present no evidence beyond mere allegations that prior to the incident giving rise to this case, the City had notice that its hiring or retention of Roethlisberger would result in a constitutional injury. Without notice, there is no deliberate indifference on the part of the City. *See Atkinson*, 709 F.3d at 1217. Without facts to

49

demonstrate a genuine issue for trial, Plaintiffs' mere allegations cannot defeat summary

judgment. *See Robinette*, 476 F.3d at 591.

### e. *Monell* Claims for Failure to Investigate

Defendants assert summary judgment should be granted for the City on Plaintiffs' failure

to investigate claims because there is no evidence that a municipal custom or policy caused

investigators to conduct a negligent investigation which shocked the conscience, and to an extent

that Bufford was deprived of his due process rights (Doc. 83 at 26).  Defendants further argue

that Plaintiffs failed to allege specifically how any alleged failure to investigate deprived them or

Bufford of any federal right as required by law, and their claim, therefore, fails (*id*. at 27).

Plaintiffs respond that Defendants are not entitled to summary judgment on this claim

because the police failed to conduct a thorough investigation, the file sent to the circuit attorney's

office was not reviewed and may never be reviewed, and Plaintiffs' hired experts, including a

forensic expert and policing expert, came to different conclusions than the SLMPD investigators

who performed no reconstructive investigation (Doc. 95 at 26).  Plaintiffs further assert Sack

failed to adequately supervise Roethlisberger and Walls when he failed to thoroughly asses their

conduct during the incident, including the initial decision to stop Bufford, the impact of Bufford

and the police vehicle, Roethlisberger's unholstered firearm while pursuing Bufford, the lighting

in the gangway, the inherent danger of Roethlisberger's conduct in pursuing an individual in the

dark for an ordinance violation, and the damage to the Tahoe (*id*. at 26-27).  Plaintiffs' expert,

Epperson, identified numerous deficiencies in the investigation (*id*. at 27).  Plaintiffs argue they

have described in detail how the City perpetuated a policy or unofficial custom of permitting

excessive force by the circuit attorney not reviewing officer-involved shootings and thereby not

enforcing the use of force policies (*id*.).  Plaintiffs also assert the SLMPD failed to adequately

investigate the events such that Roethlisberger and Walls may have been reprimanded or

disciplined in other ways, and as a result, Bufford's constitutional rights were violated, and no efforts were made in good faith to investigate the violation or to redress wrongdoing (*id*.).

In their Reply, Defendants assert that there is no evidence in the record that a City custom or policy caused investigators to conduct a negligent investigation which shocked the conscience or resulted in investigatory failures that deprived Plaintiffs of their due process rights (Doc. 96 at 10). Additionally, Defendants assert Plaintiffs failed to allege how any failure to investigate deprived them or Bufford of a federal right as required under § 1983, and do not do so in their response (*id*.).

As noted above, despite Plaintiffs' allegations, the City's failure to investigate this incident does not demonstrate a "continuing, widespread, or persistent pattern of misconduct," or that its alleged investigative failures are the "moving force" behind the alleged violation of Plaintiffs' constitutional rights. *See Lollie*, 2015 WL 3407931 at *6. Plaintiffs do not show, beyond conclusory allegations, that the City failed to investigate incidents of excessive force which occurred before the incident here that were not investigated. Accordingly, Plaintiffs have not shown that the alleged errors and deficiencies in the investigation of this incident were the moving force behind the alleged constitutional violations.

### 4. Counts IX, X, XI: State Law Claims of Wrongful Death, Survival Action, and Negligence Against the City; and Counts XIV, XV, and XVI: State Law Claims of Wrongful Death, Survival Action, and Negligence Against Sack

In Counts IX and XIV, Plaintiffs allege Wrongful Death Actions against the City and Sack pursuant to Mo. Rev. Stat. § 537.080 *et. seq*., claiming the City is vicariously liable for the wrongs of its employees committed within the scope of their employment (*id*. at 31-32). In Counts X and XV, Plaintiffs allege Survival Actions against the City and Sack pursuant to Mo. Rev. Stat. § 537.020, claiming the City is vicariously liable for the wrongs of its employees committed within the scope of their employment (*id*. at 33-34). In Counts XI and XVI, Plaintiffs

allege Negligence actions against the City and Sack pursuant to Mo. Rev. Stat. §§ 537.020, 537.030, and 537.060, claiming the City is vicariously liable for the wrongs of its employees committed within the scope of their employment based on the impact that occurred between the Tahoe and Bufford as a result of Walls maneuvering the vehicle to block Bufford's path (*id*. at 35-37).

Defendants argue they are entitled to summary judgment on Plaintiffs' state law claims against the City because the City is protected by sovereign immunity and Plaintiffs did not allege or provide evidence that the City waived sovereign immunity by purchasing liability insurance or by adopting, by ordinance, a self-insurance plan for the purpose of insuring against Plaintiffs' claims (Doc. 83 at 27).  More specifically, with respect to the Wrongful Death and Survival Action claims, Defendants assert Plaintiffs have not alleged and cannot provide evidence that Roethlisberger's use of force fell within the limited exceptions to municipal sovereign immunity (*id*. at 28).  Defendants argue the City is similarly entitled to sovereign immunity of Plaintiffs' negligence claims regarding Walls' use of the Tahoe as they cannot provide evidence that Walls' operation of the Tahoe was negligent and cannot provide evidence that Bufford was injured when he made contact with the vehicle (*id*.).  Based on this, Defendants seek summary judgment on all state law claims against them in Counts IX, X, XII, XIV, XV, and XVI based on sovereign immunity (*id* at 29).

With respect to Plaintiffs' assertions that Defendants procured insurance for their claims, Defendants argue Plaintiffs cannot produce evidence that the City procured liability insurance to cover their claims against the City or the extent of the amount provided by such insurance plan, and as such, the City is entitled to sovereign immunity (*id*.).

In response, Plaintiffs argue that Counts IX-XI and XIV-XVI are not barred by sovereign immunity (Doc. 95 at 29).  They argue that the wrongful death and survival actions are

predicated in part on Walls' negligent operation of the Tahoe in the course of his employment (*id*.). Plaintiffs rely on their expert, Epperson, who concluded that Walls deviated from generally accepted national standards of force when he used the Tahoe in an attempt to stop Bufford for an ordinance violation (*id*.). Plaintiffs also rely on Sack's deposition testimony that maneuvering a police vehicle closely, such as one foot from a fleeing individual is risky and improper (*id*. at 29-30). Plaintiffs argue that under § 537.600.1(1), the City and Sack are not entitled to sovereign immunity for Plaintiffs' negligence counts (*id*. at 30). Plaintiffs further argue that if a jury decides Walls' operation of the police Tahoe contributed to the cause of Bufford's death, the City and Sack are not entitled to sovereign immunity on Plaintiffs' causes of action for Wrongful Death and Survival Action (*id*.).

In their Reply, Defendants argue that Plaintiffs Wrongful Death and Survival Action claims against the City and Sack in his official capacity do not contain allegations nor do they provide evidence that Roethlisberger's use of force fell within one of the limited exceptions to municipal sovereign immunity (Doc. 96 at 11). Defendants assert Missouri courts have determined municipalities are entitled to sovereign immunity in police use-of-force and deadly force cases (*id*.). Defendants state that Plaintiffs' argument that Walls' operation of the Tahoe was somehow the proximate cause of Bufford's death, and therefore the claims fall under the negligent driving exception, is legally and factually strained (*id*.). They further assert that there is no reasonable argument that Walls violated a duty of care to Bufford by positioning his vehicle in front of him or that Walls' use of the Tahoe was the proximate cause of Bufford's shooting death (*id*.). Defendants indicate they have found no Missouri caselaw extending the negligent driving sovereign immunity waiver to a situation like this, where Walls moved his vehicle to serve as a physical barricade to prevent escape (*id*.).

"In Missouri, sovereign immunity is the rule rather than the exception." *Div. of Emp. Sec., Missouri v. Bd. of Police Commissioners*, 864 F.3d 974, 980 (8th Cir. 2017) (citing Mo. Rev. Stat. § 537.600(1) ("Such sovereign or governmental tort immunity as existed at common law in this state ..., except to the extent waived, abrogated or modified by statutes ... shall remain in full force and effect....")).  Missouri law "affords public entities sovereign immunity from tort actions." *Gregg v. City of Kansas City*, 272 S.W.3d 353, 358 (Mo. Ct. App. 2008) (citing *Necker by Necker v. City of Bridgeton*, 938 S.W.2d 651, 654 (Mo. App. 1997)).  Under § 537.600, "sovereign immunity for negligent acts and omissions is waived in certain situations. The first is for injuries resulting from a public entity operating a motor vehicle. The second is for injuries caused by the condition of a public entity's property." *Id.*  Additionally,

> under § 537.610, RSMo 1994, when a public entity purchases liability insurance for tort claims, sovereign immunity is waived to the extent of and for the specific purposes of the insurance purchased. *State ex rel. Board of Trustees v. Russell,* 843 S.W.2d 353, 360 (Mo. banc 1992). Any waiver of sovereign immunity is to be construed narrowly.  *Spotts v. Kansas City,* 728 S.W.2d 242, 246 (Mo.App.1987).

*Fantasma v. Kansas City, Mo., Bd. of Police Comm'rs*, 913 S.W.2d 388, 391 (Mo. Ct. App. 1996).  "The City is a municipal corporation. 'A municipal corporation is a "public entity" within the meaning of section 537.600 and section 537.610.'" *Gregg*, 272 S.W.3d at 358 (quoting *State ex rel. City of Marston v. Mann,* 921 S.W.2d 100, 102 (Mo.App.1996).  Furthermore,

> "[T]he plaintiff bears the burden of demonstrating the existence of the insurance and that it covered his particular claim." *Id.* "[F]inding a municipality liable for torts is the exception to the general rule of sovereign immunity, and a plaintiff must plead with specificity facts demonstrating his claim falls within an exception to sovereign immunity." *Id.* at 242.

*Gregg*, 272 S.W.3d at 359–60.

Defendants cite *Conway v. St. Louis Cnty.*, 254 S.W.3d 159, 167 (Mo. App. 2008) for the proposition that municipalities are entitled to sovereign immunity in police use-of-force cases, including deadly force cases (Doc. 83 at 28).  In that case, the court noted that "keeping the peace, enforcing laws and ordinances, and preserving the public health are just some of the duties within the province of a municipality as a governmental agency and upon which the municipality acts without liability."  *Conway*, 254 S.W.3d at 167 (quoting *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo. App. 2007)).  The facts in *Conway* involved the shooting of plaintiffs' son by police officers after they were called to his house by his mother. *Id*. at 163.  Upon entry into his room, he moved toward the officers swinging a sword, was not deterred by a beanbag gun, and was then shot and killed as he continued to move toward the officers swinging the sword.  *Id*.  The court determined that the city "was performing a governmental function in providing police services to its citizens and therefore was entitled to immunity for the actions of the police defendants. There was no evidence to show an exception or waiver existed to defeat [the city's] sovereign immunity."  *Id.* at 167.

Here, Plaintiffs have provided no evidence their Wrongful Death or Survival Action claims fall within an exception to sovereign immunity.  Instead, they merely allude to a connection of these claims to the negligence claim which they assert *does* fall within an exception.  Plaintiffs cite no caselaw supporting their contentions.  Additionally, Plaintiffs do not respond to Defendants' arguments that Plaintiffs have provided no evidence that the City procured liability insurance to cover their claims, despite it being Plaintiffs' burden to do so.  *See Gregg*, 272 S.W.3d at 359–60.  Thus, the City and Sack are entitled to sovereign immunity as to Plaintiffs Wrongful Death and Survival Action claims, and summary judgment will be granted in their favor.

55

With respect to their negligence claims, Plaintiffs assert sovereign immunity is waived because the incident falls under the exception for the negligent operation of a motor vehicle within the scope of employment.  Plaintiffs cite *Southers v. City of Farmington*, 263 S.W.3d 603, 620 (Mo. banc 2008) for the proposition that a city is not immune from *respondeat superior* liability relating to a police officer's negligent operation of a motor vehicle within the course of his employment, and that even if an officer is protected by official immunity, those protections cannot be extended to the City because the legislature intended the City to face liability in such cases (Doc. 95 at 28).  Defendants contend Plaintiffs have failed to meet their burden to prove the causation element of the motor vehicle exception, and as a result, the City is entitled to sovereign immunity on this claim.

Public entities are protected from liability and enjoy sovereign immunity for negligent acts subject to two exceptions: "(1) the 'motor vehicle exception' and (2) the 'dangerous condition exception.'"  *Williams v. Missouri Highway & Transp. Comm'n*, 16 S.W.3d 605, 610 (Mo. Ct. App. 2000), *as modified* (Mar. 28, 2000); Mo. Rev. Stat. § 537.600.  Pursuant to § 537.600.1(1), sovereign immunity is waived "for '[i]njuries directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles ... within the course of employment.'"  *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 764–65 (Mo. 2006) (quoting § 537.600.1(1)).  "This is an 'absolute waiver[ ] of sovereign immunity in all cases.'"  *Id.* (quoting § 537.600.2).  "[I]n order for a government entity to be found liable under this statute, there must be a finding that a public employee of the government entity acted negligently."  *Benson v. Kansas City, Bd. of Police Comm'rs*, 366 S.W.3d 120, 124 (Mo. Ct. App. 2012).  "[T]he public duty doctrine does not shield government entities from liability where the legislature has waived sovereign immunity for the type of negligence alleged by the plaintiff, even if the public duty doctrine shields the negligent employee from personal liability."  *Id.* at

56

125; *see also Throneberry v. Missouri State Highway Patrol*, 526 S.W.3d 198, 208 (Mo. Ct. App. 2017); *Southers*, 263 S.W.3d at 620 ("there can be no immunity protections for the City where statutes provide its immunity protections are waived").

For the exception to apply, Plaintiffs are required to plead and prove, *inter alia*, Bufford's injury "directly resulted from" Walls' alleged negligent operation of a motor vehicle.  Mo. Rev. Stat. § 537.600.1(1); *see Williams*, 16 S.W.3d at 611 (analyzing pleading and proof requirements of the "dangerous condition exception" within the same statute as the "motor vehicle exception" and utilizing the same phrase).  Courts have determined the phrase "directly resulted from" within § 537.600 is "synonymous with 'proximate cause.'"  *Williams*, 16 S.W.3d at 611 (referring to the identical phrase in §537.600.1(2), the "dangerous condition exception").

The determination of whether proximate cause exists is usually a question for the jury,

> "however, a court properly interposes its judgment in this determination when the evidence reveals the existence of an intervening cause that eclipses the role the defendant's conduct played in the plaintiff's injury." *Id.* at 665; *see also Meyer v. City of Walnut Grove*, 505 S.W.3d 331, 336 (Mo. App. S.D. 2016) (explaining that, where the evidence connecting the injury to the defendant's negligence "amounts to mere conjecture and speculation," the question of proximate cause "becomes one of law").

*Rayman v. Abbott Ambulance, Inc.*, 546 S.W.3d 12, 18 (Mo. Ct. App. 2018).  The analysis of proximate cause and intervening cause proceed as follows:

> "The general test for proximate cause is whether the claimed injury is the natural and probable consequence of the defendant's alleged negligence." *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 563 (Mo. banc 2014). Proximate cause thus is determined by "looking back, after the occurrence, and examining whether the injury appears to be a reasonable and probable consequence of the conduct." *Wilmes v. Consumers Oil Co. of Maryville*, 473 S.W.3d 705, 722 (Mo. App. W.D. 2015) (quoting *Robinson v. Mo. State Highway & Transp. Comm'n*, 24 S.W.3d 67, 78 (Mo. App. W.D. 2000)). "Proximate cause cannot be based on pure speculation and conjecture." *Dilley v. Valentine,* 401 S.W.3d 544, 548 (Mo. App. W.D. 2013) (quoting *Stanley v. City of Independence*, 995 S.W.2d 485, 488 (Mo. banc 1999)). We must decide each case on its own facts. *Nail*, 436 S.W.3d at 563.

In cases involving multiple negligent actors, a question arises as to whether the initial act of negligence was a proximate cause of the injury, or whether an efficient, intervening cause "eclipsed the role of the original actor's negligence in the plaintiff's injury." *Esmond v. Bituminous Cas. Corp.*, 23 S.W.3d 748, 753 (Mo. App. W.D. 2000); *see also Boggs v. Lay*, 164 S.W.3d 4, 18 (Mo. App. E.D. 2005). "An efficient, intervening cause is a new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury, but it may not consist of merely an act of concurring or contributing negligence." *Hargis v. Lankford*, 372 S.W.3d 82, 87 (Mo. App. S.D. 2012) (quoting *Buck v. Union Elec. Co.*, 887 S.W.2d 430, 434 (Mo. App. E.D. 1994)). The issue is whether the intervening act so supersedes the defendant's earlier conduct as to excuse its responsibility thereof. *Buck*, 887 S.W.2d at 434.

*Id.* at 18-19. Additionally,

"'To the extent the damages are surprising, unexpected, or freakish, they may not be the natural and probable consequences of a defendant's actions.'" *Id.* at 61 (quoting *Callahan*, 863 S.W.2d at 865). "'[T]he negligence of [the] defendant need not be the sole cause of the injury ... [i]t is sufficient that it be one of the efficient causes thereof, without which the injury would not have resulted.'" *Crane v. Drake*, 961 S.W.2d 897, 902 (Mo.App.1998) (*quoting Patrick v. Alphin*, 825 S.W.2d 11, 13 (Mo.App.1992)).

*Williams*, 16 S.W.3d at 611.

Here, whether Walls' operation of the Tahoe was the proximate cause of Bufford's death is a question of law. *See Rayman*, 546 S.W.3d at 18. This is so because the connection between Bufford's impact with the Tahoe and Bufford's *shooting* death is based on pure speculation and conjecture. *See id.* Although Bufford made impact with the Tahoe and fell to the ground, he immediately stood up, ran from the Officers, attempted to scale a fence, broke free from Roethlisberger after he had gotten him to the ground in the initial gangway, and ran down another gangway and attempted to scale a second fence. Based on these actions, it is unclear whether Bufford incurred *any* injuries as a result of his impact with the Tahoe.[9]

---

[9] While Bufford's post-mortem examination revealed he had small abrasions to his right knee and left thigh, there are no facts establishing the origin of these injuries, as they could have resulted from Bufford's attempts to scale the fence or his interaction with Roethlisberger in the initial gangway. No evidence links these injuries to the collision with the Tahoe or indicates

Further, it was not until he was shot by Roethlisberger that Bufford suffered fatal injury. Given these facts, Bufford's injury, his shooting death, was not a reasonable and probable consequence of Walls' conduct in maneuvering the Tahoe. *See id.* The shots fired at Bufford clearly "eclipsed" Walls' alleged negligent driving, and were the "the responsible, direct, proximate and immediate cause" of Bufford's death. *Id.* at 18-19. The autopsy report identified a gunshot wound to the head as the "immediate cause" of Bufford's death. Plaintiffs' attempt to establish the collision of Bufford with the Tahoe as a proximate cause of Bufford's death would amount to mere speculation and conjecture. *See id.* at 18.

In light of Plaintiffs' failure to show Bufford's death directly resulted from Walls' alleged negligent driving, their negligence claim does not meet the sovereign immunity "motor vehicle" exception, and the City and Sack are entitled to sovereign immunity for this claim. Summary judgment will be granted in their favor.

Furthermore, even if Plaintiffs' negligence claim qualified as an exception to sovereign immunity, the City "cannot be liable for injuries arising out of [Walls'] operation of his patrol car unless the essential elements of negligence can be established." *Throneberry*, 526 S.W.3d at 208. "In any action for negligence, the plaintiff must establish that (1) the defendant had a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Id.* (citation modified) (quoting *Parr v. Breeden*, 489 S.W.3d 774, 778 (Mo. banc 2016)). "A defendant in a negligence action is entitled to summary judgment when the record reflects a complete lack of proof on any of the four elements necessary for recovery." *Franklin v. Peterson*, No. CV 14-1467 (DWF/JSM), 2016 WL 6662679, at *5 (D. Minn. Nov. 10, 2016) (internal quotation omitted). In other words, even if the Court determined the City was not entitled to sovereign immunity, Plaintiffs' negligence

---

them as contributing causes of Bufford's death.

claims would fail as a matter of law based on Plaintiffs' failure to establish Walls' operation of the vehicle was the proximate cause of Bufford's death. *See Rayman*, 546 S.W.3d at 18 ("[I]f the plaintiff cannot establish that defendant's negligent conduct was the proximate cause of his . . . injuries, his . . . negligence claim must fail.").

### B. Plaintiffs' Motion for Summary Judgment as to Counts I through XI

The Court next considers Plaintiffs' Motion for Summary Judgment (Doc. 77). Plaintiffs first assert they are entitled to summary judgment on the excessive force claims against Roethlisberger and Walls, Counts I and IV (Doc. 84 at 8). Plaintiffs set out relevant law and recite relevant facts, and note the following disputed facts: whether Bufford was publicly urinating such that probable cause existed; whether Walls ran the vehicle into Bufford or parked the vehicle close to Bufford who then ran into the vehicle; whether Bufford pointed a gun at Roethlisberger and whether Roethlisberger would have been able to see a gun while in the gangway between 533 and 535 Bates; and whether Bufford had a gun (*id*. at 5-7). Plaintiffs then summarily conclude they are entitled to judgment in their favor on Counts I and IV as a matter of law (*id* at 8).

With respect to Count V, the Wrongful Death action against Walls, Plaintiffs assert Walls violated his duty to Bufford to refrain from violating his rights, as well as a common duty as a driver to observe traffic laws and regulations (*id*. at 11). Plaintiffs assert a police officer is required to observe the care which a reasonably prudent person would exercise in the discharge of official duties, and that SLMPD police officers have sworn to use the highest degree of care in the application of force (*id*.). Plaintiffs assert Walls violated this duty by maneuvering the Tahoe in a way which caused impact with Bufford, and thus negligently operated the Tahoe (*id*.). Plaintiffs further assert that Bufford was shot by Roethlisberger approximately 30 seconds later, and that Walls' conduct in "hitting the decedent with his vehicle, directly contributed to cause

the decedent's death after being shot by Defendant Roethlisberger" (*id*. at 12). Plaintiffs also argue Walls had a duty to intervene, but failed to communicate to Roethlisberger that he should stop his pursuit or holster his weapon (*id*.). Plaintiffs conclude they are entitled to summary judgment as a matter of law on Count V (*id*.).

With respect to Counts II, III, VI, VII, VIII, IX, X, and XI, Plaintiffs recite law and facts with no analysis, and conclude they are entitled to summary judgment as a matter of law. Plaintiffs do not provide adequate analysis of the claims, facts, and evidence pursuant to the summary judgment standard for the Court to determine whether they are entitled to summary judgment.

Defendants respond that Plaintiffs motion for summary judgment and statement of uncontroverted material facts contain serious legal flaws and deficiencies and request the Court deny their motion (Doc. 93). Defendants assert Plaintiffs' admissions in their motion that several facts are disputed necessitates denial of their motion (*id*. at 2). Defendants also note Plaintiffs specifically acknowledge that the claims against Sack in his official capacity and the City are identical (*id*.). Finally, Defendants dispute Plaintiffs' reliance on certain expert testimony of Bauer, and Flowers' testimony (*id*. at 3).

Based on the rulings with respect to Defendants' motion for summary judgment and the insufficiency of Plaintiffs' motion for summary judgment, Plaintiffs' Motion for Summary Judgment (Doc. 77) will be **DENIED**.

## IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as follows. Defendants' Motion for Summary Judgment as to Count I is **GRANTED in PART** and **DENIED in PART**, as set forth above; as

to Counts II and III is **DENIED;** and as to Counts IV, V, VI, VII, VIII, VI, X, XII, XII, XIII,

XIV, XV and XVI, is **GRANTED**.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment is

**DENIED**.

      A separate judgment will accompany this memorandum and order.

      Dated this 3rd day of September, 2025.


                           _/s/ Noelle C. Collins_____
                           NOELLE C. COLLINS
                           UNITED STATES MAGISTRATE JUDGE